IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

GARLAND CAMPER                                                                               PLAINTIFF

V.                                              4:12CV00124 JMM

F.G. "BUDDY" VILLINES, County Judge,
individually and in his official capacity;
KARLA BURNETT, individually and in her official
capacity; and PULASKI COUNTY, ARKANSAS                                    DEFENDANTS

ORDER

Pending is the Motion for Summary Judgment filed by the Defendants. Plaintiff has responded to the motion and the Defendants have replied. For the reasons set forth below, the motion is granted.

I.      Facts

Defendant F.G. "Buddy" Villines ("Villines") is the Pulaski County Judge, and chief executive officer of Pulaski County. (Complaint, at 2). Defendant Karla Burnett ("Burnett") is the Pulaski County Attorney. Pulaski County, Arkansas is a political entity within the State of Arkansas and an employer within the meaning of 42 U.S.C. § 2000, *et seq.* Villines appointed Plaintiff Garland Camper as the Pulaski County Coroner on April 8, 2008.

As Coroner, Camper hired Jane Doe ("Doe") to work in the Coroner's Office in January, 2010. (Camper Dep., Part 1, at p. 76). Camper, as Doe's supervisor, warned Doe several times during her tenure about her mistakes and carelessness on the job. *Id.* at p. 28. As a result, Doe was suspended from duty on June 4, 2010 until June 8, 2010 for failure to follow a directive in the disposition of a case. *Id.* at p. 76-77. After her suspension, Doe's performance improved "for a month to two months, but she began making mistakes again." *Id.* at p. 81-82. Camper

fired Doe on November 29, 2010. *Id.* at p. 28. Camper made the decision to terminate Doe when she failed to properly investigate a case on which she was the primary investigator. *Id.* at p. 81-82. After her termination, Doe asked Camper repeatedly to allow her to return to work at the Coroner's Office. *Id.* at p. 34.

On January 7, 2011, Camper saw Doe at a strip club, the Paper Moon, where she was performing as a dancer. *Id.* at p. 26. According to Camper, he did not receive a lap dance from Doe, but she did touch him sexually. *Id.* at p. 91. Doe told Camper that she would like to "get together" that night and Camper understood that as an invitation to get together in a sexual way. *Id*. at 93. At that time, Doe did not ask if she could return to work for Camper. *Id.* at 26.

The following day, Camper began texting Doe. *Id.* Camper's cell phone was owned and paid for by Pulaski County. *Id.* at 85. Camper's cell phone records indicate that he and Doe exchanged 467 text messages between January 8 and January 28, 2011. (Exh. 5 to Camper Dep.). The text messages included sexual content. (Camper Dep., Part 1, at p. 91). Camper wanted to have sexual relations with Doe. *Id.* Early Saturday morning, January 15th, Camper asked Doe to meet him at the morgue. *Id.* at 26-27, 95. During this meeting, Doe and Camper had sex and Doe expressed an interest in returning to work for the Coroner's Office. *Id.* at 26-28, 95. Camper offered to rehire her. *Id.* at 27. In fact, Camper rehired Doe on the following Tuesday, January 18, 2011. *Id.* at 34. Camper expressed a desire to continue their sexual relationship if Doe agreed. *Id.* at p. 123.

Camper and Doe continued to text after she started working for the Coroner's Office on January 20, 2011. *Id.* at 102. Doe was hired to fill a new position the Quorum Court had approved for Camper's budget. *Id.* at 74-75. He did not advertise for the new position or

interview anyone else before he offered it to Doe. *Id.* Doe worked for the Coroner's Office on January 20th and 21st. *Id.* at 72-73. However, she did not return to work on Monday, January 24th. *Id.* Her husband ("Mr. Doe") called Camper and explained that she was sick and would come back as soon as she felt better. *Id*. at 105. Camper and Doe spoke by phone on January 26th and 27th. *Id.* at 114. On January 28th, Mr. Doe texted Camper that he was aware of the sexual relationship between his wife and Camper. *Id.* at 106. He demanded money from Camper, stating that he wanted to take his wife to California to live and get away from Camper. *Id.* at 107. At that time, Camper refused to pay Mr. Doe any money. *Id.* He also told Mr. Doe that if his wife did not return to work she would be terminated. *Id.* at 110-111.

On February 1, 2011, Camper terminated Doe's employment with the Coroner's Office. *Id.* at p. 71. On March 22, 2011, Camper received a demand letter from Burt Newell, an attorney representing Doe. *Id.* at 115, 142. The letter alleged that Doe was the subject of "sexual harassment so severe that she felt she could no longer work at the County and had to end her employment" after being rehired in January 2011. *Id.* The letter instructed Camper to contact Mr. Newell within 20 days or Ms. Doe would file a charge of discrimination with the EEOC. (Exh. 7 to Camper Dep.).

On March 29, 2011, Camper presented the demand letter to Defendant Burnett. (Camper Dep., Part 1, p. 142-143). Camper admitted to Burnett that he had made a mistake by having a physical relationship with Doe of which his wife was not aware. *Id.* Burnett stated that she would make contact with Doe's attorney, Burt Newell. *Id.* at p. 143. Although Camper told Burnett that he had rehired Ms. Doe, he failed to explain that he had rehired her three days after having sexual relations with her at the county morgue. *Id.*

Camper also met with Defendant Villines about the situation. Camper states that he told Judge Villines "everything, including that he had rehired Ms. Doe after they had sex." *Id.* at p. 149-150. According to Camper, Judge Villines stated that as long as nothing about the relationship came before the County, Camper would not be disciplined. *Id.*

At Camper's next meeting with Defendant Burnett, Camper was informed that the County had made an offer to settle Ms. Doe's claim but that Doe had rejected the offer. *Id.* at p. 131. Camper was further notified that the County would not be instrumental in helping him settle the claim. *Id.* As a result, Camper personally settled the claim by paying a total of $20,000 to Doe. *Id.* at p. 132.

On Monday, April 11, 2011, Judge Villines informed Camper that he had until the end of the day to resign from his position as Coroner or he would be terminated. *Id*. at p. 164-165. For this reason, Camper resigned. According to Camper, Judge Villines agreed to keep the information regarding Camper's resignation confidential by stating that the resignation was a "personnel matter and nothing else." *Id.* at p. 24. However, local media reported that Judge Villines blamed the resignation on Camper's ongoing conflicts with local police agencies. (Exh. 11-5). Villines was quoted as saying, "They were just giving me their concerns and the problems it was causing for them. . . . They're out there trying to do their job and then someone is making comments about their job and how they do it. It just didn't need to happen." *Id.* Villines added, "I think he's a good man. He just made some mistakes." *Id.*

As a result of these comments by Villines, Camper asked Pulaski County Quorum Court members for an opportunity to publically clear his name. *Id.* at p. 67-70. A name-clearing hearing was never offered to Camper. *Id.*

On February 27, 2012, Camper filed suit against Villines, Burnett, and Pulaski County, Arkansas for race discrimination in violation of Title VII, the Arkansas Civil Rights Act, 42 U.S.C. §§ 1981, 1983, and 1988. Camper also makes state law claims of wrongful termination/outrage against all defendants, detrimental reliance or promissory estoppel against Villines and malpractice against Burnett.

**II.     Standard for Summary Judgment**

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided solely on legal grounds. *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed. R. Civ. P. 56. The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry is the threshold inquiry of determining whether there is a need for trial -- whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The Eighth Circuit Court of Appeals has cautioned that summary judgment should be invoked carefully so that no person will be improperly deprived of a trial of disputed factual issues. *Inland Oil & Transport Co. v. United States*, 600 F.2d 725 (8th Cir. 1979), *cert. denied*, 444 U.S. 991 (1979). The Eighth Circuit set out the burden of the parties in connection with a summary judgment motion in *Counts v. M.K. Ferguson Co.*, 862 F.2d 1338 (8th Cir. 1988):

> [T]he burden on the moving party for summary judgment is only to demonstrate, *i.e.*, '[to] point out to the District Court,' that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and, if the record in fact bears out the claim that no

> genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted.

*Id.* at 1339. (quoting *City of Mt. Pleasant v. Associated Elec. Coop.*, 838 F.2d 268, 273-274 (8th Cir. 1988) (citations omitted)(brackets in original)). Only disputes over facts that may affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248.

### III. Federal Claims

#### A. Employment Discrimination

Camper claims that he was forced to resign his position as Pulaski County Coroner because of his race, African-American. Camper concedes that he does not have direct evidence of racial discrimination and, therefore, relies on the *McDonnell Douglas* framework to prove his case. Under this framework, a plaintiff must first establish a prima facie case of employment discrimination. If the plaintiff presents a prima facie case, the burden of production shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the adverse employment action. *Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1046 (8th Cir. 2002). If the employer produces such a reason, the plaintiff must present evidence that the nondiscriminatory reason offered is, in fact, a pretext for intentional discrimination. *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 935 (8th Cir. 2006).

In this case, the Court need not consider whether Camper has established a prima facie case because the Defendants have offered a legitimate, nondiscriminatory rationale for its actions, that Camper has not rebutted. *See, e.g., Arraleh v. County of Ramsey*, 461 F.3d 967, 976

(8th Cir. 2006) (declining to examine whether a prima facie case of employment discrimination had been established and instead relying upon the employee-plaintiff's failure to show the employer-defendant's stated rationale to be a pretext in upholding an adverse grant of summary judgment). The Defendants state that Camper was asked to resign because he violated the County's policy regarding sexual harassment by engaging in sexual relations with Ms. Doe, a former employee, and then re-hiring her. Further, Camper offered to continue the sexual relationship once Ms. Doe was his employee. These facts are undisputed by Camper and provide a reasonable non-discriminatory reason for his termination.

Camper argues that there have been white employees of the County who were treated more favorably in similar situations. Although Camper claims to have multiple examples, there is evidence of only one other County employee who was not terminated after having a sexual relationship with another County employee, Defendant Burnett. Defendant Burnett stated in her deposition that she had a relationship with Kyle Prater, an employee of the County Assessor's Office. (Burnett Dep. Ex. 23-4 at p. 36.) Camper contends that Burnett also had a relationship with Mike Hutchens, the County Administrator. Ms. Burnett's relationships with these individuals are not similar to the relationship Camper had with Doe because there is no evidence that Ms. Burnett hired either individual to work for her or that Ms. Burnett was ever the supervisor of either individual. The fact that Villines was the supervisor of Burnett, Hutchens, and Prater is irrelevant. The issue is whether Ms. Burnett was similarly situated to Camper with regard to her relationships with County employees. The Court finds that she was not similarly situated to Camper.

Camper also argues that the Defendants shifted their reason for his termination which is

evidence of pretext. *See Lake v. Yellow Transp., Inc.,* 596 F.3d 871, 874 (8th Cir. 2010). Camper contends that Villines initially told the media that Camper was terminated because of conflicts with police agencies and now states that Camper was terminated for violation of the County sexual harassment policy.  Further, Camper points out that Villines submitted a letter to the Pulaski County Quorum Court on December 31, 2010 praising Camper.  While the Defendants may have shifted the public explanation of Camper's termination, the evidence indicates that Villines refrained from making public Camper's relationship with Doe at Camper's request.  Further, the reason for Camper's termination was made clear to Camper by Villines and Burnett and has not shifted.  The letter written by Villines in 2010 regarding Camper's qualifications tends to reinforce the Defendants' position that the Defendants held no racial animus toward Camper.  Accordingly, the Court finds that Camper has failed to present evidence that the Defendants' reason for requesting his resignation was a pretext for discrimination, and Plaintiff's claim for discrimination is dismissed.

   **B.**   **Due Process**

  Camper alleges that he was deprived of his liberty interest in his good name by Villines when Villines gave allegedly false reasons for Camper's resignation.  Camper claims he was stigmatized by Villines' statements that Camper was always in conflict with police agencies, that virtually every police agency had complaints about Camper injecting himself into news coverage of crimes, and that Camper had a tendency to talk to the press about opinions rather than go to police agencies directly.  (Complaint at p. 6-7).

  "To establish a procedural due process claim against a state employer for deprivation of a protected liberty interest in a public employee's reputation, [the plaintiff] must demonstrate: (1)

an official made a defamatory statement that resulted in a stigma; (2) the defamatory statement occurred during the course of terminating the employee; (3) the defamatory statement was made public; and (4) an alteration or extinguishment of a right or legal status." *Frazier v. Ark. Lottery Comm., 2011 WL 5553807, *4 (E.D. Ark. 2011)* (quoting *Crooks v. Lynch,* 557 F.3d 846, 849 (8th Cir. 2009)).

Defendants argue that Judge Villines' statements did not rise to the level of a constitutional violation. "An employee's liberty interest is implicated only where the employer levels accusations at the employee that are so damaging as to make it difficult or impossible for the employee to escape the stigma of those charges. The requisite stigma has generally been found when an employer has accused an employee of dishonesty, immorality, criminality, racism, and the like." *Frazier, 2011 WL 5553807, *4* (internal citations omitted). "Unsatisfactory performance or general misconduct are insufficient to create a stigma that implicates an employee's liberty interest in his reputation." *Mascho v. Gee*, 24 F.3d 1037, 1039 (8th Cir. 1994) (citing *Robinson v. City of Montgomery City*, 809 F.2d 1355 (8th Cir. 1987)).  In *Robinson*, the Eighth Circuit held that a city press release which indicated that the city was dissatisfied with the discharged police chief's performance was insufficiently stigmatizing to implicate the liberty interests of the chief. *Robinson*, 809 F.2d at 1356. Similarly, in *Shands v. City of Kennett*, the Eighth Circuit held that an employer's media statement that the plaintiff had been terminated for insubordination and misconduct did not rise to the requisite level of constitutional stigma. *See Shands*, 993 F.2d 1337, 1347 (8th Cir. 1993). Villines' comments were no more damaging than the statements made in *Robinson* and *Shands*.

Because Judge Villines' comments did not create the level of stigma required to implicate

9

a constitutionally protected liberty interest, Plaintiff's claim for violation of his due process rights is dismissed.

### IV.     State Law Claims

After dismissal of Plaintiff's federal claims, the Court declines to exercise supplemental jurisdiction over the remaining state law claims.  *See* 28 U.S.C. § 1367(a), (c); *Crest Const. II, Inc. v. Doe*, 660 F.3d 346, 359 (8th Cir. 2011) ("A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary.").

### V.     Conclusion

For the reasons set forth above, Defendants' Motion for Summary Judgment (Docket # 10) is GRANTED as to Plaintiff's federal claims and the Court declines to exercise supplemental jurisdiction over the Plaintiff's state law claims.  The Clerk is directed to close the case.

IT IS SO ORDERED this 28th day of February, 2013.

_____
James M. Moody
United States District Judge